Earl William **WALKER**,
Jr., et al., Plaintiffs,

v.

**LIGGETT GROUP, INC.,**
et al., Defendants.

Civil Action No. 2:97–0102.

United States District Court,
S.D. West Virginia,
Charleston Division.

Aug. 5, 1997.

---

James Humphreys, Teresa C. Postle, James F. Humphreys & Associates, L.C., Charleston, WV, Kenneth B. McClain, Gregory Leyh, Humphrey, Farrington & McClain, P.C., Independence, MO, for Plaintiff.

Eugene T. Hague, Jr., Parkersburg, WV, Francis H. Hare, Jr., Hare, Wynn, Newell and Newton, Birmingham, AL, Dianne M. Nast, Robert J. LaRocca, Roda & Nast, Lancaster, Pa, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, Wendell Gauthier, Metairie, LA, Calvin C. Fayard, Jr., Fayard & Honeycutt, Denham Springs, LA, Gary Robert Fine, Rodham & Fine, Ft. Lauderdale, FL, on Behalf of Certain Class Members in Scott V. The American Tobacco Co., No. 96–8461 (C.D.C. Louisiana) and Certain Putative Class Members in Arch V. American Tobacco Co., No. 96–5903 (E.D.PA), and Putative Class Members Herein.

Kenneth E. Knopf, Benjamin T. Hughes, Pullin, Knopf, Fowler & Flanagan, Charleston, WV, Michael M. Fay, Aaron H. Marks, Daniel R. Benson, Marc E. Kasowitz, Joseph R. Hawry, George Santa, Kasowitz, Benson, Torres & Friedman, New York, NY, for Defendant.

Lee Dymits, San Francisco, CA, Pro se.

Jason Huber, Forman & Crane, L.C., Charleston, WV, Leslie Brueckner, Arthur H. Bryant, Trial Lawyers for Public Justice, Washington, DC, Steve Baughman, Baron & Budd, Dallas, TX, for Cynde Westmoreland.

Webster J. Arceneaux, III, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, WV, John D. Shuff, Janette L. Skeels, Robins, Kaplan, Miller & Ciresi, San Francisco, CA, for Blue Cross and Blue Shield of Minnesota.

T. Roe Frazer, II, Melissa C. Patterson, Langston, Frazer, Sweet & Freese, Jackson, MS, for Burl Butler, Henry Lee White, Mae White, Clyde Maine, Robert V. Watson, Jettie Bradley, Arthur Bolden and Joyce Carrothers.

Walter M. Little, Coal Township, PA, for Walter M. Little.

Eugene T. Hague, Jr., Parkersburg WV, for James E. McCune.

Raymond Marano, Coal Township, PA, for Raymond Marano.

James M. Dunyan, Coal Township, PA, for James M. Dunyan.

Stanley Rasalla, Coal Township, PA, Pro se.

Frederick C. Baker, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, for City of New York, New York City Health and Hospitals Corporation and County of Erie.

Thomas A. Mungavin, Coal Township, PA, Pro se.

Lawrence W. Schonbrun, Berkeley, CA, for Faye Schonbrun.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are (1) Intervenor Cydne Anne Westmoreland's motion to vacate preliminary approval of the class action settlement and preliminary certification of the mandatory settlement class; and (2) Plaintiffs' motion for class certification.[1]

---

1. Also pending are (1) Lee Dymits' motion to intervene; (2) James Dunyan's request to opt-in; (3) the parties' renewed joint motion for a preliminary injunction; (4) the motion of Blue Cross and Blue Shield of Minnesota to opt out; and (5)

motions by the *Scott* and *Arch* Intervenors (a) to strike class allegations; (b) to vacate preliminary approval of the settlement; (c) to dismiss the motion to approve the settlement; (d) to defer dissemination of the class notice; and (e) to

■ The Supreme Court's recent decision in *Amchem Products, Inc. v. Windsor*, —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) counsels strongly in favor of the Intervenor's request. Further, Plaintiffs' motion for class action status seeks certification of a nationwide class pursuant to *Rule* 23(b)(3), a certification wholly inappropriate under *Amchem*.[2]

Accordingly, the Court (1) **GRANTS** the Intervenor's motion and **WITHDRAWS** its preliminary approval and certification of the settlement and settlement class; and (2) **DENIES** Plaintiffs' motion for class certification.

## I. BACKGROUND

Plaintiff Earl W. Walker filed this lawsuit on February 3, 1997. In early April, he moved for class certification, claiming to represent a class of persons injured by, *inter alia*, the alleged defectiveness of cigarettes manufactured by the Liggett Group, Incorporated (Liggett) and its predecessors. The Defendants are Liggett and Liggett & Myers, Incorporated (L&M).[3] Also mentioned is the parent corporation, Brooke Group Limited (Brooke), which apparently would be added as a Defendant via the proposed amended complaint.

Liggett is the smallest of the "Big Five" cigarette manufacturers, accounting for about two (2) percent of the domestic cigarette market. While denying many of Plaintiffs' allegations, practical considerations ultimately intervened for Defendants. Affidavits assert Liggett is in dire financial condition and facing a crush of pending litigation.

Faced with little in the way of desirable options, Liggett chose what was, at the time, the road less traveled in the prolific tobacco litigation sweeping the nation. It entered into a comprehensive settlement agreement with Plaintiff and the putative class.[4] Liggett asserts its goal under the settlement is to continue its operations in a socially responsible fashion; likewise, Plaintiff and the putative class seek a reformation of Liggett's practices and redress for smoking-related injuries.

The settlement has three major components. The terms, while slightly oversimplified, roughly are as follows: (1) termination of costly litigation in exchange for twenty-five (25) percent of Liggett's annual pretax income for 25 years to a fund benefitting class members;[5] (2) submission to injunctive requirements, including Liggett's obligation to (a) inform the public of the past concerted activities of the tobacco industry to deny, discredit or dilute tobacco health warnings; (b) submit to Food and Drug Administration jurisdiction and regulations; and (c) limit advertising and add an addiction warning to its product; and (3) give assistance to Plain-

---

strike the renewed motion for a preliminary injunction. The Court **DENIES** these motions as moot.

Plaintiffs have filed as well two motions to amend the complaint. The motions appear premised on Liggett's promise, now non-binding, "to actively assist class counsel in seeking relief on behalf of the class for the conspiratorial and related tortious conduct of the other tobacco manufacturer Defendants named in the First Amended Complaint." Memo in supp. of motion to amend at 3. The Court thus **DENIES** the motion without prejudice.

2. Plaintiffs also sought certification of their medical monitoring claims pursuant to other provisions of *Rule* 23(b). West Virginia does not recognize a cause of action for medical monitoring. *See McClenathan v. Rhone–Poulenc, Inc.*, 926 F.Supp. 1272, 1281 (S.D.W.Va.1996)(stating "our Court of Appeals recently concluded there is no basis in West Virginia law for a separate cause of action for medical monitoring.").

3. L&M is an assetless corporate shell and a subsidiary of Liggett.

4. Liggett has previously settled a number of Medicaid reimbursement lawsuits brought on behalf of certain states. Liggett also announced a settlement in a pending class action in Alabama styled *Fletcher v. Liggett Group. Inc.*, No. CV 97–913 (Ala. Cir. Ct., Mobile Cty.), which is similar to the instant resolution. The instant proposal appears to be a slight renegotiation of the *Fletcher* settlement. Nonetheless, there remains pending litigation pursued by a number of states. None of these sovereigns are part of the proposed class, the Court having dismissed them earlier because of Eleventh Amendment objections to jurisdiction.

5. While the ratio is unclear, the fund will be shared with several states that have also entered into settlements with Defendants.

tiffs in the prosecution of civil claims against other, more solvent tobacco companies.

The parties requested three forms of relief: (1) preliminary approval of a class action settlement agreement; (2) preliminary certification of a mandatory settlement class; and (3) a preliminary injunction enjoining all members of the settlement class from commencing, continuing or taking any action in any judicial proceeding against Defendants with respect to any smoking-related claims. The Court previously granted the first two elements of relief after a brief hearing held May 15, 1997.

The proposed class consists of the following: (a) all past and present smokers of cigarettes or users of tobacco products manufactured by Liggett or its predecessors who reside in the United States, its territories, possessions and the Commonwealth of Puerto Rico and who, prior to or during the term of the proposed Agreement, have suffered or claim to have suffered injury as a consequence thereof ("smokers"); (b) the estates, representatives, and administrators of these smokers; (c) the spouses, children, relatives and "significant others" of these smokers as their heirs or survivors; (d) all persons who reside in the United States, its territories, possessions and the Commonwealth of Puerto Rico who, prior to or during the term of the proposed Agreement, have been exposed to or claim to have been exposed to (including, through market share theory) environmental or second-hand smoke from tobacco products manufactured by Liggett or its predecessors and have suffered or claim to have suffered injury as a consequence thereof, (e) all persons or entities (including, without limitation, any territory, city, county, state, parish, possession or any other political subdivision thereof, or any agency or instrumentality of any of the foregoing, or any insurance company) in the United States, its territories, possessions and the Commonwealth of Puerto Rico, which, prior to or during the term of the proposed Agreement, have incurred or claim to have incurred losses as a result of, based on, or by reason of paying for or providing treatment for diseases, illnesses, or medical conditions allegedly caused by tobacco prod-

ucts (or exposure thereto, including by way of environmental or second-hand smoke) to the persons defined in (a) through (d) above; and (f) all persons who reside in the United States, its territories, possessions and the Commonwealth of Puerto Rico, who, prior to or during the term of the proposed Agreement, have either smoked or used tobacco products (or have been exposed thereto, including by way of environmental or second-hand smoke) and claim (i) to have suffered injury as a consequence thereof, and (ii) in connection with such claim, allege that Defendants or any of them engaged in a fraud, conspiracy, or any concerted activity with one or more other tobacco product manufacturers in the manufacturing, sale or marketing of tobacco products. The class is nothing short of enormous, including potentially tens of millions of Americans within its scope. In short, final certification would be unprecedented.

At a Preliminary Injunction hearing held May 30, the Court denied the requested Injunction without prejudice for the parties' failure to adduce evidence supporting a limited fund under *Rule* 23(b)(1)(B). Since that time, the parties have renewed their request for injunctive relief and a second hearing is scheduled for August 26, 1997. In the interim, the Supreme Court decided *Amchem* and vacated *In re Asbestos Litigation,* 90 F.3d 963 (5th Cir.1996). Based on these recent decisions, Ms. Westmoreland seeks *vacatur* of the Court's prior preliminary approval of the settlement and certification of the class.

## II.  DISCUSSION

### A.  The Amchem Decision

This Memorandum Opinion, no doubt, is one of the first of many that will interpret *Amchem.*

### 1.  Factual and Procedural Background

*Amchem* involved a district court's certification, for settlement purposes only, of a class of persons adversely affected by past exposure to asbestos products. Counsel for the plaintiffs represented scores of persons with pending lawsuits, as well as ultimately masses of anticipated future claimants with

whom they had no attorney-client relationship. After settling with the plaintiffs who had pending claims, attorneys for both adversaries launched a new case designed to settle as well the claims of those who had yet to file suit. In a single day, the district court was presented with pleadings, a proposed settlement and a joint motion for conditional class certification, not very dissimilar from the pace of events in the instant litigation.

The complaint identified nine lead plaintiffs who were designated, along with their respective families, as representatives of a class of persons who had not filed suit but (1) who had been exposed—occupationally or through the occupational exposure of a spouse or household member—to asbestos attributable to a defendant, or (2) whose spouse or family member had been so exposed. As observed by the Court:

> Untold numbers of individuals may fall within this description. All named plaintiffs alleged that they or a member of their family had been exposed to asbestos-containing products of CCR defendants. More than half of the named plaintiffs alleged that they or their family members had already suffered various physical injuries as a result of the exposure. The others alleged that they had not yet manifested any asbestos-related condition. The complaint delineated no subclasses; all named plaintiffs were designated as representatives of the class as a whole.

*Amchem,* —— U.S. at —— – ——, 117 S.Ct. at 2239–40.

The district court certified the class conditionally, and then finally, pursuant to *Rule* 23(b)(3) and entered an anti-suit injunction.

With this background, and a comprehensive discussion of the policy behind *Rule* 23 and its correct application, the Supreme Court explained "why … [the *Rule* 23] requirements [could not] be met for a class so enormously diverse and problematic as the one … certified." *Id.* at —— n. 17, 117 S.Ct. at 2249 n. 17.

## 2. Legal Analysis

The precise question faced in *Amchem* was the role settlement may play under *Rule* 23 in judging the propriety of class certification. On that precise issue, the Supreme Court's less-than-enthusiastic observation that "settlement is relevant to a class certification[,]" *Id.* at ——, 117 S.Ct. at 2248, has likely circumscribed the more generous view of our Court of Appeals, first espoused in *In re A.H. Robins Co. Inc.,* 880 F.2d 709 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989), that settlement "should be a factor, and an important factor, to be considered when determining certification." *Id.* at 740. Further, *Amchem* decimated the notion of some circuits that *Rule* 23 requisites were relaxed in the settlement context by stating "other specifications of the rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem,* —— U.S. at ——, 117 S.Ct. at 2248 (stating also "proposed settlement classes sometimes warrant more, not less caution on the question of certification.").

■ While the Supreme Court's resolution of this issue is important, its discussion of two *Rule* 23 factors, one relevant here and one not,[6] is the pivotal component of the

---

**6.** As stated recently by Professor John C. Coffee Jr., the *Amchem* decision "rests on two independent pillars: the 'predominance' requirement of Rule 23(b)(3) and the adequacy-of-representation standard of Rule 23(a)(4)." John C. Coffee Jr., *After the High Court Decision in 'Amchem Products Inc. v. Windsor.' Can a Class Action Ever be Certified Only for the Purpose of Settlement?,* Nat'l L.J., Jul. 21, 1997, at B4. The parties note correctly that in a proposed *Rule* 23(b)(1)(B) certification, the first pillar is not relevant. The second, however, is an absolute prerequisite. *See, e.g., Lukenas v. Bryce's Mountain Resort, Inc.,* 538 F.2d 594, 595 (4th Cir.1976)(stating "[t]o maintain a class action, one must satisfy *all four*

of the provisions of [Rule 23] section (a) and one of the subdivisions of section (b).")(emphasis added); *see also Amchem,* —— U.S. at ——, 117 S.Ct. at 2245; *Black v. Rhone Poulenc, Inc.,* 173 F.R.D. 156, 158 (S.D.W.Va.1996); *United Bhd. of Carpenters & Joiners of Am., Local 899 v. Phoenix Assocs., Inc.,* 152 F.R.D. 518, 521 (S.D.W.Va. 1994).

While the Court is not in the practice of utilizing news periodicals as secondary authority, a limited exception is warranted here. Professor Coffee is well-credentialed and enjoys substantial expertise in the area, demonstrated in part by the *Amchem* Court's reliance on his writings. *Am-*

decision for purposes of this case.[7]

■■■ The bedrock consideration for the Court in any certification decision is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* A principal way of ascertaining unity is by carefully examining whether, pursuant to *Rule* 23(a)(4), "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4); *see also Amchem,* —— U.S. at —— – ——, 117 S.Ct. at 2250–51 (stating " '[A] class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.' "). One necessary element in the *Rule* 23(a)(4) equation is whether there are "conflicts of interest between named parties and the class they seek to represent." *Amchem,* —— U.S. at ——, 117 S.Ct. at 2250.

The conflicts between the representatives and the class in *Amchem* were significant, and the Supreme Court's observations are worth quoting at length:

As the Third Circuit pointed out, named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses. In significant respects, the interests of those within the single class are not aligned. Most saliently, for the currently injured, the critical goal is generous immediate payments. That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future. *Cf. General Telephone Co. of Northwest v. EEOC,* 446

U.S. 318, 331, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980) ("In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes.").

The disparity between the currently injured and exposure-only categories of plaintiffs, and the diversity within each category are not made insignificant by the District Court's finding that petitioners' assets suffice to pay claims under the settlement. *See [Georgine v. Amchem Products, Inc.,]* 157 F.R.D., [246] at 291 [(E.D.Pa.1994)]. Although this is not a "limited fund" case certified under Rule 23(b)(1)(B), the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability.[8] For example, as earlier described, ... the settlement includes no adjustment for inflation; only a few claimants per year can opt out at the back end; and loss-of-consortium claims are extinguished with no compensation.

The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.

*Amchem,* —— U.S. at ——, 117 S.Ct. at 2251 (footnote added).

---

chem, —— U.S. at —— – ——, 117 S.Ct. at 2248–50 (citing John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum. L.Rev. 1343 (1995)).

**7.** As noted, *Amchem* examined both the predominance and adequacy-of-representation elements of *Rule* 23. Examination of the former would have sufficed for decertification of the *Rule* 23(b)(3) class at issue. Given the then-pending fate of *In re Asbestos Litigation,* 90 F.3d 963 (5th Cir.1996), a *Rule* 23(b)(1)(B) certification though, the *Amchem* Court intended the adequacy-of-representation discussion to extend its far-reaching policy analysis to *Rules* 23(b)(1) and (2). *In re Asbestos* was vacated two days after *Amchem's* issuance. *See Flanagan v. Ahearn,* —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997) and

*Ortiz v. Fibreboard Corp.,* —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997).

**8.** Plaintiffs assert "In this case, because of the limited availability of funds to pay potential claims, currently injured plaintiffs are put in the same position as future victims." Pls.' resp. memo at 6. In reality, however, as demonstrated by this *Amchem* excerpt, the alleged limited fund exacerbates the apparent conflicts creating what has been described as a zero-sum game. While conflicts exist in this regard, the Court cannot determine their extent. Counsel has offered very little in the way of specifics as to fund size or distribution, truly critical considerations for certification. *See infra* note 13.

### 3. Application of Amchem to the Instant Case

█ Given the breadth of the proposed settlement class, which dwarfs that considered by the Supreme Court, the Court has concerns similar to those identified in *Amchem*. First, the current complaint presents the Court with a single representative Plaintiff for a class of persons numbering potentially in the millions or tens of millions. The amended complaint seeks to add only one additional representative, Sally Wilson, who smoked a brand of cigarette different from those used by Walker. Both of these representatives suffer from serious cancers and will no doubt argue their illnesses are obvious and present manifestations of injury from prolonged cigarette smoking.

In comparison, the proposed class encompasses not only smokers whose prolonged habits led to current injury, but presumably any one of the following as well: (1) those picking up a Liggett-manufactured cigarette for the first time today, who may have manifestations 10 years, 20 years or at no time in the future; (2) those who have smoked Liggett brands, with perhaps varying nicotine and carcinogen levels, different from those employed by the representative and with different consequences; (3) those who have smoked cigarettes but who also might have independent competing causal factors such as exposure to work-related chemicals or substances such as coal dust or asbestos; (4) those who do not have cancer now but who have, or may one day have, one of a host of other smoking-related illnesses;[9] (5) those with fortuitous exposure to second-hand smoke as well as those who live or work on a day-to-day basis with Liggett smokers; and (6) an immense number of other individuals with symptoms and exposure histories varying on a sliding scale from serious to benign, frequent to infrequent. The class is so uniquely expansive as to hold within its confines persons ranging in age from infants *in utero* to individuals such as 135 year-old All Mohammed Hussein, who currently smokes sixty (60) cigarettes everyday.[10] The various combinations of subclasses within this gargantuan assembly of plaintiffs would appear to defy definition, much less division.

█ Defendants' lone relevant argument to forestall the result is that limited fund class actions are equitable proceedings that, like *in rem* or interpleader actions, necessarily bring before the Court all possible present and future claimants.[11] They assert future claimants have to be before the Court because the principles of equity upon which *Rule* 23(b)(1)(B) is based demands their

9. Michael K. Mahoney, *Coughing the Cash: Should Medicaid Provide for Independent State Recovery Against Third–Party Tortfeasors Such as the Tobacco Industry?*, 24 B.C. Envtl. Aff. L.Rev. 233, 236 (1996)(stating "Though tobacco advocates likely would argue otherwise, the causal relationship between smoking and disease is as well established as any other in modern medicine. Most notable perhaps are the several forms of cancer found among smokers. Cigarette smoking causes more than eighty-five percent of all lung cancer, which now has surpassed breast cancer as the primary cause of death from cancer among American women. Smoking also induces cancers of the mouth, larynx, esophagus, stomach, pancreas, uterus, cervix, kidney, and colon. Along with cancer, smoking also gives rise to eighty percent of deaths from pulmonary diseases like emphysema and bronchitis. In addition, there are the thousands of heart attacks, strokes, and cases of both vascular disease and aortic aneurysm attributable to cigarette smoking."); U.S. Dep't of Health & Human Servs., *Reducing the Health Consequences of Smoking: 25 Years of Progress, A Report of the Surgeon General* 11 (1989)(stating "Smoking is responsible for more than one of every six deaths in the United States.").

10. Mr. Hussein, because of his Lebanese citizenship, technically would not qualify for class membership. *See At 135, He May Be World's Oldest Person*, The Seattle Times, April 2, 1997, at A10.

11. This statement is inaccurate, at least so far as the instant case is concerned. The settlement excludes states that refuse to submit to the jurisdiction of the federal court. While the Court's decertification is not based on the presence or absence of a limited fund, the exclusion of the states presents a large obstacle to certification under *Rule* 23(b)(1)(B). Certification and an anti-suit injunction would put class members' personal litigation efforts on hold pending notice and other class proceedings. This likely would allow the states to "leapfrog" class members in obtaining judgment and perhaps send Liggett into bankruptcy before the Plaintiffs here could effect resolution of their claims. In that instance, the only purpose of certification would have been to disadvantage those class members who would have otherwise bested the states in the race to judgment.

Also of concern to the Court is the fact that the fund here is much like sand moving through an

presence. The Court does not disagree. Nonetheless, *Rule* 23(a)(4) must be satisfied for any proposed limited fund class, regardless of perceived notions of equity. If the class is of such diversity and enormity that adequacy of representation cannot be achieved, even with separate representatives and subclasses, certification is inappropriate.[12] In sum, quite ironically, due process trumps what one might consider a result more equitable than insolvency, assuming that would eventuate.[13]

While the Intervenor raises other, weighty arguments, she has demonstrated adequately why certification, under either *Rules* 23(b)(1)(B) or (b)(3) cannot occur on these facts after *Amchem.* Accordingly, the Court (1) **GRANTS** the Intervenor's motion and **WITHDRAWS** its preliminary approval and certification of the settlement and settlement class; and (2) **DENIES** Plaintiffs' motion for class certification.

## III. CONCLUSION

While the parties differ in their reading of the Supreme Court's intentions, the bedrock similarity between *Amchem* and the instant case is manifest: "The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem,* —— U.S. at ——, 117 S.Ct. at 2251. Ultimately, by analogy to *Amchem,* "the establishment of a grand-scale compensation scheme" like that proposed here might be "a matter [better] fit for legislative consideration...." *Amchem,* —— U.S. at ——, 117 S.Ct. at 2249.

For the foregoing reasons, the Court (1) **GRANTS** the Intervenor's motion and **WITHDRAWS** its preliminary approval and certification of the settlement and settlement class; and (2) **DENIES** Plaintiffs' motion for class certification.

hourglass with a hole in the bottom globe. A limited-fund finding would have been facilitated greatly by the presence of a discrete, identifiable *res* rather than the amorphous corporate entity proffered by the parties.

12. Defendants assert the Settlement Agreement's existing structures are sufficient to protect class members' interests, given they all share a common interest in maximizing the limited fund available from Defendants. While this is indeed a common interest, it is wholly insufficient to vitiate the very real, substantial conflicts among class members relating to distribution of the fund and other key concerns.

Defendants would also burden the Court with the unenviable task of creating subclasses and appointing representatives. That burden, of course, rests with the parties at this early stage. Were such a redrawing of lines appropriate, however, it truly would be equivalent to "closing the barn door after the horses have escaped." Intervenor's reply memo at 11. The creation of proposed subclasses should have been done prior to the settlement to ensure that global resolution would address the interests of each subclass.

Further complicating the creation of subclasses and avoidance of conflicts in this nationwide class action is a problem identified by Professor Coffee:

A grayer issue involves any attempt to cover class members from jurisdictions having materially different applicable legal standards. For example, if jurisdiction A recognizes strict liability while jurisdiction B requires proof of negligence and accords special defenses to the defendants, this difference may again require subclasses because the residents of jurisdiction A have inherently stronger legal claims.

John C. Coffee Jr., *supra* note 5, at B6.

13. Unlike the *Amchem* settlement, counsel have kept the details of fund size and proposed distribution close to the vest, in part, and inexplicably, "to avoid distracting the parties and the Court...." Settlement Agt. at ¶ 7.11. Rather creatively, the parties propose to lay before a settlement board the "equitable adjudication" of compensation claims, while seeking final certification prior to Board consideration of the claims. *Id.* The Board, and ultimately the Court (*see id.* at ¶ 7.6), thus is handed the herculean task of then considering "any and all comments, recommendations, requests and suggestions from Settlement Class members and their counsel, as to the appropriate and equitable allocation and distribution of the Settlement Fund ...." *Id.* First, the Court is left to ponder the particulars of how class members will offer input. Many class members, of course, would be disenfranchised practically during the comment period, *e.g.,* children and incompetent persons. Second, from a class numbering perhaps in the tens of millions, all with differing opinions about the smoking-related effects they have suffered, the input process would devolve inevitably into a bewildering babble.